UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

PETR BOCEK,                        )
                                   )
              Plaintiff,           )
                                   )
v.                                 )    Civil Action No. 1:11-cv-546
                                   )
JGA ASSOCIATES, LLC, et al.,       )
                                   )
              Defendants.          )

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Defendants JGA Associates, LLC's ("JGA"), Joseph P. Amato's ("Amato"), and A2 Medical Group, Inc.'s ("A2") Motion for Summary Judgment.  This diversity case concerns Plaintiff Petr Bocek, MD's ("Dr. Bocek") allegations that Defendants JGA, Amato, and A2 breached fiduciary and contractual duties stemming from a business relationship when Defendants JGA and Amato terminated their contract with Dr. Bocek, usurped and subsequently acquired a business opportunity that JGA and Amato were contracted to provide him, and then fraudulently conveyed their interest in the acquired entity by assignment to Defendant A2.  There are three issues before the Court.  The first issue is whether JGA fraudulently conveyed the rights it held to Allergy Care Centers, Virginia, Inc.'s ("Allergy Care Centers") assets to A2

and, if so, whether a constructive trust might be imposed upon A2 to remediate against Dr. Bocek's loss.  The second issue is whether either JGA or Amato, in undertaking this particular business relationship with Dr. Bocek, owed Dr. Bocek fiduciary duties arising independently of the contractual relationship and the duties owed therein and, if so, whether those fiduciary duties were breached by the conduct at issue in this case, giving rise to recovery in tort.  The third issue is whether JGA breached the terms of an alleged oral contract with Dr. Bocek, entitling him to participate in the purchase of and ultimately acquire an interest in Allergy Care Centers.  The Court will grant Defendants' Motion for Summary Judgment because Dr. Bocek has failed to adduce sufficient evidence to raise genuine issues of material fact as to each of the claims in his Amended Complaint.

Plaintiff Dr. Petr Bocek is an allergist living in Maryland, and is licensed to practice medicine in Virginia and Maryland.  Defendant JGA is a business consulting firm and a Virginia Limited Liability Company, specializing in providing development strategies and financing consultation services to entrepreneurs and existing business owners.  Defendant Amato is an individual and a resident of Virginia, and is the sole member and manager of JGA.  Defendant A2 is a Virginia Corporation, and was formed during the conduct at issue in this litigation to

purchase and acquire the assets of Allergy Care Centers.  Amato is a Director of A2.  Allergy Care Centers is a Virginia Corporation, and provides medical treatment to individuals suffering from allergies.  Since its 2011 acquisition, A2 now operates the ten offices formerly owned and operated by Allergy Care Centers.

Dr. Bocek was referred to JGA to assist him in starting up a medical practice in November 2010.  At that time, Dr. Bocek represented to JGA that he was a medical doctor specializing in allergy/immunology, and sought JGA to research the feasibility and facilitate the startup of a new allergy/immunology practice.

On November 10, 2010, Dr. Bocek and JGA entered into a Letter of Agreement (the "Consulting Agreement"), outlining the services and fees associated with securing third party financing for the development, underwriting, and funding of a start-up medical practice.  The Consulting Agreement defined Bocek as the "Client" and JGA as the "Consultant," and also stated that "[t]he initial term of the Agreement shall remain open.  This agreement may be canceled with ten (10) days written notice by either party at anytime [sic]."  In addition, "the Consultant shall render such other services as may be agreed upon by the Client and the Consultant from time to time."  The Consulting Agreement further provided that, "[t]he Client agrees that the Consultant has the right to act an [sic] agent representing the

3

Client to interested Parties during the term of this Agreement .
. . ."

In an email dated November 15, 2010, Dr. Bocek inquired for
the first time whether it was feasible to purchase an existing
medical practice.  His email indicated that Allergy Care
Centers, where Dr. Bocek was previously employed, was for sale.
In a subsequent email that same day, Dr. Bocek informed JGA that
his potential acquisition of Allergy Care Centers would be "even
more complicated because the practice [Allergy Care Centers] now
ows [sic] me a severance package and I currently have a lawyer
negotiating the matter with them.  I would have to talk to my
lawyer whether this would even be an option for us given current
circumstances."  Two days later, Dr. Bocek continued to
represent that he had not received an answer from his lawyer
regarding the possibility of acquiring Allergy Care Centers,
stating, "[m]y dispute with them concerning the severance
package is not settled yet."

On December 1, 2010, JGA informed Dr. Bocek that JGA had
reached out to Peter Klenk, executor of the Estate of Charles
Valentine, who was handling the sale of Allergy Care Centers as
the decedent was the former owner.  Dr. Bocek replied the next
day that he still had not heard from his lawyer but, if JGA
"felt that the acquisition of [Allergy Care Centers] is
financially feasible and business-wise sound [sic] I think I

4

could wrap up the matters of severance pay with [Allergy Care Centers] relatively quickly." Dr. Bocek concluded the email by informing JGA that "it is still very important that in any of your future communication with the Estate I am not being mentioned as the potential buyer." Unbeknownst to JGA or Amato, Dr. Bocek's attorney was not only aggressively negotiating a severance agreement, but also attempting to reach an agreement with Allergy Care Centers not to disparage Dr. Bocek to third parties; Allergy Care Centers rejected the proposition.

On December 11, 2010, Dr. Bocek again indicated to JGA that his attorney still wanted to keep any inquiries to Allergy Care Centers without him being mentioned, pending the severance talks. Therefore, JGA, through Amato, discussed the possibility of having JGA act as a straw purchaser of Allergy Care Centers and immediately transferring ownership of it from JGA to Dr. Bocek in order to avoid Allergy Care Centers learning the identity of the true purchaser. Naturally, Amato and Dr. Bocek discussed various options if JGA were to be successful in purchasing Allergy Care Centers, including: (1) an opportunity to purchase the practice from JGA, or a potential new company set up by JGA, after JGA and the Estate completed the transaction; (2) a partnership with a new company set up by JGA to purchase Allergy Care Centers if Dr. Bocek was not able to afford the practice in its entirety from JGA; or (3) Dr. Bocek

might work as the new company's medical director or as a key employee at his former salary if he was not able to afford the purchase of Allergy Care Centers from JGA or its new company.

Indeed, Amato expressed the parties' possible intentions to Dr. Bocek in a December 23, 2010 email, stating "that our firm or alternate holding company intends to initially purchase the practice with the direct intention of selling the practice (or holding company) to you." Amato also stated to Bocek "that you will commit to work with our firm during the due diligence process with the sole intention of becoming the eventual owner of [Allergy Care Centers]," and that "[t]he bottom line is that we would intend on transferring ownership to you as soon as all the parties agree we can, that is after our firm's purchase of the practice from the estate."

In late December, Dr. Bocek attempted at times to get Amato to warrant or guarantee that Dr. Bocek would be a part of JGA's exit strategy. In a December 27, 2010 email, Dr. Bocek inquired whether he would be the owner of Allergy Care Centers from the date of purchase and whether JGA had any interest in owning Allergy Care Centers. Dr. Bocek's email also stated, "[a]ll of my relationship with JGA and their exit strategy will be put into a transparent contract prior to the purchase [of Allergy Care Centers]," and, "I will make [a] contractual commitment to JGA to take over ACC as owner from the day of purchase and will

6

start working . . ." Amato, on behalf of JGA, replied the next day, "[b]ut please understand our intention once we own the business would be to sell the business to you . . ." No subsequent written contractual commitment between the parties concerning Dr. Bocek's role in the purchase of Allergy Care Centers was ever reached.

JGA initially scheduled January 27, 2011 to conduct a site visit at the Vienna, Virginia office of Allergy Care Centers. The goal of the meeting was for Amato, as a representative of JGA, to meet with Allergy Care Centers' practice manager, Ms. Margaret Crook, and with one of the potential lenders, Mr. Brian August. However, the visit was rescheduled for February 8, 2011 because of inclement weather. At the rescheduled meeting, Ms. Crook, Mr. August, and Amato discussed various operational issues. At some point during the meeting, Ms. Crook informed Mr. August and Amato that the practice's former medical director, Dr. Bocek, was fired from Allergy Care Centers for reasons related to sexual misconduct towards staff members and other unlawful conduct concerning fraudulent prescriptions.

After this revelation from Allergy Care Centers' practice manager, JGA sought to verify the information it learned regarding Dr. Bocek's termination from Allergy Care Centers. JGA received from Allergy Care Centers evidence that Dr. Bocek's employment with Allergy Care Centers was terminated on October

21, 2010, and that he had to be escorted from the premises by local police.  One of the reasons for his termination was his lewd remarks and solicitation of sexual behavior to a female employee on October 14, 2010.  Dr. Bocek also signed four trespass notification forms prohibiting him from being able to come upon the premises of four of the Allergy Care Centers locations for a one year period.  Despite these revelations concerning Dr. Bocek, JGA decided to proceed with the acquisition process and executed a Letter of Intent permitting JGA or its assigns to acquire the assets of Allergy Care Centers.

On February 17, 2011, JGA, through Amato, terminated its contractual relationship with Dr. Bocek by written letter pursuant to the terms set forth in the Consulting Agreement of November 10, 2010.  On February 22, 2011, counsel for Dr. Bocek responded by written letter to JGA, stating, "we hereby advise you that you are no longer authorized to act on behalf of Dr. Bocek for any purpose, including for the purchase of ACC."

On March 2, 2011, Mr. Jeffrey Renzulli, Mr. August, and Amato formed Defendant A2 Medical Group, Inc., and became its three Directors.  Pursuant to the Letter of Intent, Allergy Care Centers entered into and executed an Asset Purchase Agreement with A2 on May 13, 2011.  A2 obtained funding through the Business Bank and closed on the purchase of Allergy Care Centers

8

on June 22, 2011.  At no time between the February 17, 2011
termination and A2's closing did Dr. Bocek make any offer to
purchase Allergy Care Centers or its assets.

Dr. Bocek filed his original Verified Complaint on May 19,
2011.  Dr. Bocek agreed to dismiss Allergy Care Centers as a
party on June 24, 2011, and filed his Verified Amended Complaint
on July 22, 2011, which added A2 as a Defendant.  In his
Verified Amended Complaint, Dr. Bocek alleges the following
Counts:  I (Fraudulent Conveyance and Constructive Trust),
against Defendants JGA and A2; II (Breach of Fiduciary Duties),
against Defendants JGA and Amato; III (Breach of Contract),
against Defendant JGA; and IV (Breach of Fiduciary Duty),
alternatively, against Defendants JGA and Amato.  Defendants
JGA, Amato, and A2 now jointly move the Court for summary
judgment pursuant to Federal Rule of Civil Procedure 56.

The Court must grant summary judgment when "the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  FED.
R. CIV. P. 56.  Rule 56 mandates the entry of summary judgment
against a party who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The
Court construes all reasonable inferences in favor of the non-
moving party when determining whether there is a genuine issue

of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 255 (1986). The mere existence of some disputed facts does
not merit a trial unless the disputed facts are material to an
issue necessary for proper resolution of the case and the
quality and quantity of the evidence offered to support a
question of fact are adequate to support a jury verdict.
Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d
1317, 1323 (4th Cir. 1995).

Virginia's fraudulent conveyance statute states, in
pertinent part:

> Every gift, conveyance, assignment or transfer of . .
> . any estate, real or personal . . . given with intent
> to delay, hinder or defraud . . . persons of or from
> what they are or may be lawfully entitled to shall, as
> to such . . . persons . . . be void.

Va. Code Ann. § 55-80. Virginia courts require a Plaintiff
seeking to set aside a conveyance as fraudulent to prove "(i)
the conveyance of property to another (ii) with the intent to
hinder, delay, or defraud (iii) a creditor, purchaser, or other
person (iv) from what they are or may be lawfully entitled to."
Patel v. Anjali, LLC, 81 Va. Cir. 264, 269 (2010); Efessiou v.
Efessiou, 41 Va. Cir. 142, 145 (1996); see Colonial Inv. Co.
Cherrydale Cement Block Co., 73 S.E.2d 419, 422 (Va. 1952). The
level of proof necessary "to set aside a fraudulent conveyance
must be clear, cogent and convincing[,] and the burden rests on

10

the party alleging the existence of fraud." <u>Bruce v. Dean</u>, 140 S.E. 277 (Va. 1927).  Only the first element is at issue here.

Plaintiff contends that JGA's execution of the Letter of Intent, permitting JGA or its assigns to purchase the assets of Allergy Care Centers, supports the assertion that JGA participated in the conveyance of Allergy Care Centers by enabling an assignment of its right to purchase to A2.  That assignment being alleged to be fraudulent, Plaintiff asks this Court to set aside the conveyance and impose a constructive trust upon A2.

Here, however, Plaintiff cannot establish the existence of a conveyance by JGA because JGA never owned Allergy Care Centers' assets to convey them.  Allergy Care Centers did not bind itself when it executed the Letter of Intent with JGA, nor did JGA bind itself to acquire the assets.  The Letter of Intent served to permit JGA or its assigns to purchase Allergy Care Centers' assets.  In the end, A2 purchased the assets of Allergy Care Centers directly from the Estate.  JGA never acquired Allergy Care Centers' assets, and therefore JGA never had any legal right or entitlement to those assets.  Having no legal interest in Allergy Care Centers, JGA could not legally have conveyed or assigned any rights to the assets of Allergy Care Centers.  Therefore, Plaintiff fails to establish the necessary conveyance that is to be set aside as fraudulent because

11

Plaintiff cannot show JGA ever owned Allergy Care Centers'
assets to convey them to A2.  There being insufficient evidence
for a reasonable trier of fact to conclude otherwise, Defendants
are entitled to summary judgment with respect to Plaintiff's
fraudulent conveyance claim in Count I.

An action for breach of fiduciary duty can sound in
contract or tort.  See Augusta Mut. Ins. Co. v. Mason, 645
S.E.2d 290, 294 (Va. 2007).  Under Virginia law, "the
determination [of] whether a cause of action sounds in contract
or tort depends on the source of the duty violated.  Id. at 294
(citing Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.,
507 S.E.2d 344, 347 (Va. 1998).  While "a single act or
occurrence can . . . support causes of action both for breach of
contract and for breach of a duty arising in tort[,]" "[t]o
avoid turning every breach of contract into a tort," Virginia
law requires that "in order to recover in tort for breach of
fiduciary duty, 'the duty tortiously or negligently breached
must be a common law duty, [and] not one existing between the
parties solely by virtue of the contract.'" Augusta, 645 S.E.2d
at 293 (internal citations omitted).  In other words, "[t]he law
of torts provides redress only for the violation of certain
common law and statutory duties involving the safety or persons
and property, which are imposed to protect the broad interests

of society." Id. at 295 (quoting Filak v. George, 594 S.E.2d 610, 613 (Va. 2004).

When fiduciary duties flow from an agency relationship that arises solely from a contractual agreement, relief for a breach of those duties must be sought per the contract. See Augusta, 645 S.E.2d at 294-95.  In Augusta, Augusta Mutual alleged that its employee and agent, Jones, with whom it was in a contractual agreement with, breached his duties of good faith and of loyalty by acting adverse to its interests as principal. Augusta, 645 S.E.2d at 294.  "Augusta Mutual alleged that th[e]se fiduciary duties existed apart from any duties Jones may have had to Augusta Mutual pursuant to the contract," thereby permitting a recovery in tort for these duties arising independently of the parties' agreement.  Id. (internal quotations omitted).  The Supreme Court of Virginia rejected that argument, however, and found that "the duties Jones allegedly violated [were] nothing more than fiduciary duties an agent owes to his or her principal[,]" a relationship that existed solely because of the parties' contractual agreement. Augusta, 645 S.E.2d at 294-95.  Naturally, that Court concluded that "[b]ut for the existence of the Agency Agreement, neither Jones nor Lee-Curtis would have owed any fiduciary duty to Augusta Mutual[,]" and the fact that those duties arose by implication does not automatically mean that they are common law duties for which recovery may be sought

13

in tort.  Id. at 295.  Therefore, because the kind of fiduciary duties allegedly breached were the kind of fiduciary duties sourced in any agency relationship—a relationship that was created and governed by the parties' agreement—recovery for such an alleged breach of duty would have to be sought per the contract, and not in tort.  Id.  Based on this conclusion, the Supreme Court of Virginia held that Augusta Mutual failed to assert a valid claim for breach of fiduciary duties because the cause of action sought recovery in tort and the duties allegedly breached did not sound in tort.  Id.

Here, Dr. Bocek similarly argues that JGA and Amato breached fiduciary duties of loyalty and to refrain from self-dealing, and that these fiduciary duties to Bocek arose independently of its contractual duties.  Indeed, Dr. Bocek asks this Court to reject Augusta for the proposition that a breach of fiduciary duty cannot stand where the parties had any sort of agreement.  Although Augusta may not be read quite that broadly, Augusta does stand for the proposition that when fiduciary duties flow from an agency relationship arising from a contractual agreement, relief for a breach of those duties must be sought per the contract.

In this case, like in Augusta, but for the Consulting Agreement dated November 10, 2010 between Dr. Bocek and JGA, creating an agency relationship, neither JGA nor Amato would

14

have owed any fiduciary duties to Dr. Bocek.  Under these circumstances, Augusta clearly instructs that Dr. Bocek can seek relief for a breach of those fiduciary duties only per the Consulting Agreement because the source of the fiduciary duties owed to Dr. Bocek flow from the same.  Because the fiduciary duties in this case arose from the Consulting Agreement, and not independently of the parties' contractual obligations, the recovery in tort Dr. Bocek seeks is proscribed as a matter of law.  Dr. Bocek being unable to establish a claim for which recovery can be had in tort, Defendants are entitled to summary judgment on the breach of fiduciary duties claims in Count II.

In an effort to avoid the harsh result of Augusta, Dr. Bocek argues alternatively in Count IV that JGA and Amato, as joint business venturers with Dr. Bocek, breached fiduciary duties owed to Dr. Bocek as a business partner by acting adversely to Dr. Bocek's interests, engaging in self-dealing, and violating the duty of loyalty owed amongst partners.  In that context, with such fiduciary duties arising at common law, Dr. Bocek asserts that these duties arose independently of the Consulting Agreement and thus permit recovery in tort.  However, the Court need not reach the issue of whether or not a breach of fiduciary duties stemming from a joint venture permit recovery in tort because Dr. Bocek has not adduced any evidence

demonstrating the existence of a joint venture relationship between himself, JGA, and Amato.

Under Virginia law, "[a] joint venture is established by contract, express or implied, where two or more persons undertake a specific business enterprise for profit, with each to share in the profits or losses and each to have a voice in the control and management." Ortiz v. Barrett, 278 S.E.2d 833, 840 (Va. 1981). Indeed, the Fourth Circuit, applying Virginia law, has found critical the presence of both (1) an "agreement to share in the profits or losses," and (2) that each of the partners in the alleged venture "ha[s] a voice in the control and management." Flip Mortg. Corp. v. McElhone, 841. F.2d 531, 539 (4th Cir. 1988) (quoting Ortiz, 278 S.E.2d at 840).

Here, there is absolutely no evidence to support the conclusion that Dr. Bocek, JGA and Amato ever entered into an agreement, express or implied, to share in the profits or losses of Allergy Care Centers. It is undisputed that the Consulting Agreement entered into by the parties on November, 10, 2010 was solely for the purposes of retaining JGA for consulting services. The Consulting Agreement is void of any language that could be construed as providing for the sharing of profits or losses between Dr. Bocek and JGA. There is not a scintilla of evidence in this case that would support the existence of an implied agreement to share profits or losses. In fact, of the

16

various potential Allergy Care Center outcome scenarios discussed—(1) an opportunity to purchase the practice from JGA, or a potential new company set up by JGA, after JGA and the Estate completed the transaction, (2) a partnership with a new company set up by JGA to purchase Allergy Care Centers if Dr. Bocek was not able to afford the practice in its entirety from JGA, or (3) Dr. Bocek might work as the new company's medical director or as a key employee at his former salary if he was not able to afford the purchase of Allergy Care Centers from JGA or its new company—tellingly, none of these scenarios even suggest an arrangement whereby Dr. Bocek would be entitled to share in the profits or losses.  Because Dr. Bocek has not adduced any evidence to raise a genuine dispute of material fact with respect to the existence of a joint venture, Defendants are entitled to summary judgment as a matter of law on the breach of fiduciary duty claims in Count IV.

Finally, with respect to Dr. Bocek's breach of contract claims in Count III, the Court should grant Defendants Motion because the allegedly breached oral contract, purportedly giving Dr. Bocek a right to participate in the purchase of Allergy Care Centers, was never an extant agreement capable of being breached in the first place.  Dr. Bocek theorizes that the contract breached in this case is either (1) an oral modification to the written Consulting Agreement of November 10, 2010, or (2) an

17

oral agreement that incorporates the Consulting Agreement's compensation terms and is memorialized in more than one writing. Impliedly, then, Dr. Bocek does not contend that the Consulting Agreement, by its own terms, entitled him to participate in the purchase of Allergy Care Centers, nor does Dr. Bocek contend the existence of any express written contract that entitled him to participate in the purchase of Allergy Care Centers. However, both of Dr. Bocek's theories must fail as there is no evidence that the oral contract allegedly breached ever validly existed due to the absence of a meeting of the minds on the issue of Dr. Bocek's entitlement to rights in Allergy Care Centers subsequent to the execution of the Consulting Agreement.[1]

Central to Dr. Bocek's case is the asserted existence of an oral agreement executed subsequent to the Consulting Agreement, and thus the Court applies general principles of Virginia contract law. Oral contracts are enforceable. To constitute a valid oral contract, or oral modification of a written agreement, "there must be a meeting of the minds." Harris v. Citizens Bank & Trust Co., 200 S.E. 652, 665 (Va. 1939); accord, Moorman v. Blackstock, Inc., 661 S.E.2d 404, 409. This term of art refers to the presence of mutuality of assent, and "[u]ntil the parties have a distinct intention common to both and without

---

[1] Dr. Bocek does not allege a breach of the written Consulting Agreement of November 10, 2010.

doubt or difference, there is a lack of mutual assent and, therefore, no contract." Moorman, 661 S.E.2d at 409 (quoting Phillips v. Mazyck, 643 S.E.2d 172, 175 (Va. 2007). However, when the parties intend to reduce their oral agreement to writing, "there is a strong presumption that no contract exists until a contract is formally signed and in writing." Moorman, 661 S.E.2d at 410 (citing Atlantic Coast Realty Co. v. Robertson, 116 S.E. 476, 478 (Va. 1923); accord, Echols v. Echols, 1987 WL 484583, at *3 (Va. App. July 13, 1987). "Overcoming such a presumption requires 'strong evidence'" of a mutuality of assent between the parties. Moorman, 661 S.E.2d at 410 (quoting Andrews v. Sams, 353 S.E.2d 735, 737 (Va. 1987).

Here, Dr. Bocek is unable to prevail on a claim for breach of an oral agreement to purchase Allergy Care Centers because Dr. Bocek has not adduced sufficient evidence that there was ever a meeting of the minds between him and JGA that Dr. Bocek would have rights to Allergy Care Centers' assets. Certainly there is evidence of preliminary negotiations between the parties concerning various options if JGA were to be successful in acquiring Allergy Care Centers—(1) an opportunity to purchase the practice from JGA, or a potential new company set up by JGA, after JGA and the Estate completed the transaction; (2) a partnership with a new company set up by JGA to purchase Allergy Care Centers if Dr. Bocek was not able to afford the practice in

19

its entirety from JGA; or (3) Dr. Bocek might work as the new company's medical director or as a key employee at his former salary if he was not able to afford the purchase of Allergy Care Centers from JGA or its new company—but at no point was this ever reduced to writing, memorialized, or even mutually agreed upon without doubt or difference.

Although Dr. Bocek contends that the alleged oral agreement was made on December 15, 2010 or December 16, 2010, even as late as December 23, 2010, JGA utilized future language of intention, evidencing the absence of an agreement. In Amato's December 23, 2010 email he stated "that [JGA] or alternate holding company intends to initially purchase the practice with the direct intention of selling the practice (or holding company) to you." Amato also stated to Bocek "that you will commit to work with our firm during the due diligence process with the sole intention of becoming the eventual owner of [Allergy Care Centers]," and that "[t]he bottom line is that we would intend on transferring ownership to you as soon as all the parties agree we can, that is after our firm's purchase of the practice from the estate." Thus, at this point, the potential goal of the business relationship between JGA and Dr. Bocek was for JGA to directly acquire Allergy Care Centers with an intention that Dr. Bocek would play a future role.

Critically, however, and further evidencing a lack of mutual assent between the parties, is Dr. Bocek indicating his desire to make a future contractual commitment.  Dr. Bocek's email stated, "[a]ll of my relationship with JGA and their exit strategy will be put into a transparent contract prior to the purchase [of Allergy Care Centers]," and, "I will make [a] contractual commitment to JGA to take over ACC as owner from the day of purchase and will start working . . ."  Not only does this obviate the fact that Dr. Bocek clearly believed at that time no agreement had been reached, his comments also indicate a desire consummate a formal agreement.

Virginia law is clear that, under such circumstances, there is a strong presumption that no contract exists until a contract is formally signed and in writing; a presumption which requires "strong evidence" to overcome.  It is undisputed that no subsequent written contractual commitment between the parties concerning Dr. Bocek's role in the purchase of Allergy Care Centers was ever executed or even memorialized.  Moreover, Dr. Bocek has failed to sufficiently establish that a meeting of the minds actually occurred.  The foregoing evidence adduced by both parties supports a conclusion to the contrary.  There is no evidence of a meeting of the minds that would in any way entitle Dr. Bocek to participate in the acquisition of Allergy Care

Centers.  Accordingly, Defendants are entitled to summary

judgment on claims in Count III.


_____/s/_____
Claude M. Hilton
United States District Judge


Alexandria, Virginia
April  5 , 2012

22