IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

PETR BOCEK,                      )
                                 )
    Plaintiff,                   )
                                 )
        v.                       )   1:11-cv-0546 (JCC/JFA)
                                 )
JGA ASSOCIATES, LLC, ET AL.,     )
                                 )
    Defendants.                  )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on remand from the
Court of Appeals for the Fourth Circuit for a determination of
what remedies, if any, Plaintiff Petr Bocek ("Bocek") shall
receive due to Defendants' breach of their fiduciary duties to
him.  After remand and reassignment, the Court reopened
discovery on the issue of remedies and conducted a one-day,
nonjury trial on December 8, 2015.  Having carefully considered
the evidence presented and parties' proposed findings of fact
and conclusions of law, the Court will award Bocek damages of
$156,000 plus postjudgment interest.

## I.  Background

The facts underlying liability in this case are
established in prior opinions and presumed known.  Those
background facts are summarized here only to the extent
necessary to frame the present findings as to remedies.

Bocek is a medical doctor specializing in the treatment of allergies.  Until being fired on October 21, 2010, Bocek was employed as a full-time physician and medical director at a multi-office medical practice called Allergy Care Centers ("ACC").  After being fired, he entered into a consulting agreement with Defendant JGA Associates, LLC ("JGA") to investigate the feasibility of opening a new medical practice.  Defendant Joseph Amato ("Amato") is the owner and sole member of JGA.

Five days later, the focus of the parties' relationship shifted when Bocek raised the possibility of acquiring ACC instead of starting a new practice.  Bocek advised Amato that ACC's prior owner, Charles Valentine ("Valentine"), had passed away in 2008 and Valentine's estate ("Estate") could be willing to sell ACC at a discount.  Bocek asked Amato to investigate this possibility, but Bocek instructed that his name strictly be left out of any negotiations because his involvement could impair Bocek's ongoing severance negotiations with ACC.

Defendants began to investigate the possibility of acquiring ACC's assets.  They conducted research on the value of ACC, engaged in many communications with the Estate, and attempted to identify alternate funding structures for acquiring ACC after Bocek disclosed that he did not have sufficient capital to commit to the transaction.  These efforts led to JGA

agreeing to a nonbinding letter of intent with the Estate, which gave JGA or its assigns an option to purchase ACC's assets for $1,000,000.  The Estate approved this agreement on February 8, 2011.

Earlier on February 8, Amato discovered some unsettling facts regarding Bocek's termination from ACC.  Until this time, Amato had accepted Bocek's explanation that he was fired because his salary was overburdening ACC and limiting the Estate's ability to sell the practice.  On February 8, however, Amato learned from ACC's practice manager that Bocek was fired amidst allegations that he sexually harassed a nurse, engaged in similar misconduct at a work Christmas party, and wrote himself prescriptions for narcotics on another doctor's prescription pad.  Bocek was also made to sign four no-trespass orders for ACC property and was escorted off ACC grounds by police.  After verifying these allegations, Amato sent Bocek a letter on February 17, 2011, terminating the contract between Bocek and JGA.  The letter noted "it became apparent . . . that your involvement in any potential transaction would . . . sour the deal.  It also became evident that we could not move forward with your participation in any potential transaction without the possibility of serious repercussions thereafter."  (Def.'s Ex. 28.)

Two days before this letter, the Estate submitted a petition to a Pennsylvania court to approve JGA's acquisition of ACC's assets for $1,000,000. With the sale going forward, Bocek requested the due diligence reports from JGA and warned that JGA acquiring ACC would be a breach of its fiduciary duties to him. Instead of abandoning the ACC acquisition or transferring the opportunity to Bocek, Amato incorporated A2 Medical Group ("A2") to acquire ACC pending the Pennsylvania court's approval. On May 13, 2011, JGA assigned its interest in ACC to the newly formed A2 and on June 22, 2011, the Pennsylvania court approved the $1,000,000 sale, making A2 the owner of ACC.

After unsuccessfully seeking a preliminary injunction to stop the transfer of ACC's assets to A2, Bocek filed an amended complaint raising four causes of action, including breach of fiduciary duties. A court in this district granted summary judgment for defendants as to all causes of action. *See Bocek v. JGA Assocs., LLC*, No. 1:11-cv-546, 2012 WL 1161469, at *5 (E.D. Va. Apr. 5, 2012). The Fourth Circuit reversed and remanded the breach of fiduciary duties claim. *See Bocek v. JGA Assocs., LLC*, 537 F. App'x 169, 178 (4th Cir. 2013). On remand, the court conducted a nonjury trial and granted judgment to Defendants because Bocek failed to prove the existence of an agency relationship for the acquisition of ACC and because Bocek failed to establish that any alleged breach caused damages. *See*

4

*JGA Assocs., LLC*, No. 1:11-cv-546 (E.D. Va. Feb. 11, 2014), ECF No. 211.  Bocek appealed this ruling.

On appeal, the Fourth Circuit held "as a matter of law that Bocek proved that the defendants breached their fiduciary obligations to Bocek by appropriating the ACC opportunity for themselves."  *See Bocek v. JGA Assocs., LLC*, 616 F. App'x 567, 576 (4th Cir. 2015).  Additionally, the Fourth Circuit concluded that the district court's damages findings were clearly erroneous.  *Id.* at 577.  Thus, the court remanded the case "for entry of judgment in favor of Bocek on the issue of liability and for a new trial on the issue of what, if any, remedies Bocek is entitled to as a result of the defendants' breach."  *Id.* at 578.

After remand, the case was reassigned to this Court. The Court reopened discovery on the issue of remedies and conducted a one-day, nonjury trial on December 8, 2015. Thereafter, the parties submitted their proposed findings of fact and conclusions of law.  After careful consideration of the evidence and argument presented at trial and in the parties' memoranda, the Court issues the following findings of fact and conclusions of law.

## II.  Legal Standard

As this case comes before the Court on remand, the mandate rule applies.  *See United States v. Bell*, 5 F.3d 64, 66

(4th Cir. 1993).   The mandate rule "is merely a specific application of the law of the case doctrine," which "prohibits lower courts, with limited exceptions, from considering questions that the mandate of a higher court has laid to rest." *CoreTel Va., LLC v. Verizon Va., LLC*, 808 F.3d 978, 679 (4th Cir. 2015).   When the appellate court "contemplated that the district court would conduct additional fact-finding," however, the district court may rely on new facts, to the extent doing so does not undermine issues "laid to rest" by the mandate.   *Id.*

In the present case, the Fourth Circuit remanded for "a new trial on the issue of what, if any, remedies Bocek is entitled to as a result of the defendants' breach." *Bocek*, 616 F. App'x at 578.   Additionally, the Fourth Circuit "offer[ed] no view regarding Bocek's entitlement to any remedy he has requested, including the imposition of a constructive trust." *Id.* at 578 n.7.   Thus, the Fourth Circuit contemplated that this Court should consider additional facts and has not "laid to rest" the availability of any remedies.

Under Rule 52(a)(1) of the Federal Rules of Civil Procedure, after trying an action without a jury, "the court must find the facts specially and state its conclusions of law separately."   Fed. R. Civ. P. 52(a)(1).   In accordance with those principles, the Court makes the following findings of fact and conclusions of law.

6

### III.   Findings of Fact

Bocek began working at ACC in 2003 as a part-time physician receiving an hourly fee.  (Tr. 83, 86.)[1]  In 2007, Bocek became the only full-time, board-certified allergist at ACC and began serving as the medical director.  (Tr. 81-82, 86.)  His salary that year was $225,000, with $45,000 more in benefits.  (Tr. 86-87.)  Bocek also negotiated with ACC's owner, Valentine, to receive yearly salary increases of $60,000, up to a total of $200,000.  (Tr. 88.)  These yearly increases were based on the projection that ACC's workload would increase and that ACC would open a new practice in Pennsylvania.  (Tr. 87.)  In 2008, Valentine passed away and ACC's assets became part of his Estate.  (Tr. 88.)  Bocek's salary continued to increase after Valentine's passing, outpacing the anticipated $60,000 yearly increases.  (Tr. 88.)  In 2009, Bocek received $444,776 in baseline salary and in 2010 he received $449,428.  (Pl.'s Ex. 12 at 26.)  With benefits, Bocek received over $500,000 a year in both 2009 and 2010.  (Tr. 49, 83, 87-88.)

Bocek was fired from ACC on Thursday, October 21, 2010.  (Def.'s Ex. 25-C.)  At that time, Bocek was removed from ACC premises by a police officer and made to sign four no-trespass orders for ACC offices in Montgomery County, Maryland.

---

[1]   Citations to "Tr." refer to the transcript of the nonjury trial on the issue of damages held on December 8, 2015.  [Dkt. 266.]

(Def.'s Ex. 25-B.)  These orders and his firing were motivated by a nurse's complaint that Bocek sexually harassed her at work on October 14, 2010, in addition to a prior allegation of sexual harassment from a female employee, allegations that Bocek wrote himself prescriptions for narcotics on another doctor's prescription pad, and intermittent absences from work.  (Def.'s Ex. 25-C.)  Bocek's large salary also contributed to his firing. (Tr. 100.)

        In anticipation of trial, business and valuation expert Joseph Estabrook ("Estabrook") attempted to estimate how much income Bocek lost as a result of not being able to pay himself a salary and benefits for working at ACC from February 2011 through 2015.  (Pl.'s Ex. 12 at ex.5.)  Estabrook made this estimation by first averaging Bocek's salary from 2009 and 2010 to establish a baseline annual income of $447,102.  (*Id.* at 26.) He then grew that annual salary by a 4 percent cost of living adjustment each year and added $60,500 in annual benefits.  (*Id.* at 26, ex.5.)  After accounting for present value and subtracting various measures of projected mitigation earnings, Estabrook estimated that Bocek lost between $1,225,000 and $1,368,000 by not being able to employ himself at ACC from February 2011 through 2015.  (*Id.* at 27, ex.5.)

        Estabrook's lost income calculations did not factor in Bocek's full-time salary from 2007, 2008, or 2009, and did not

8

account for any consideration of ACC's actual performance in any year.  (Pl.'s Ex. 12 at ex.5; Tr. 64-66.)  Estabrook testified that the post-sale performance of ACC was not relevant to his estimation because he operated off the assumption that Bocek would be running ACC, whereas A2 was operating ACC after June 2011.  (Tr. 66.)

Under one of the mitigation scenarios, Estabrook referred to an industry salary database to determine the median salary for an allergist working at a medical practice with ten physicians.  (Pl.'s Ex. 12 at ex.5; Tr. 50.)  According to Estabrook's analysis, such a doctor would receive $234,832 a year plus $30,000 in benefits.  (Pl.'s Ex. 12 at ex.5; Tr. 50.)  At the time Bocek was fired from ACC, the practice employed one full-time physician (Bocek) and four part-time physicians who worked one or two days a week.  (Tr. 82.)  Of those, Bocek was the only board-certified allergist.  (Tr. 82.)

Bocek's actual income since being terminated from ACC is unknown.  After being fired and losing the opportunity to acquire ACC, Bocek continued to pursue opening his own practice. (Tr. 114.)  In the summer of 2011, he secured a loan of $600,000 to be applied toward this goal.  (2013 Tr. 107.)[2]  In April 2012, Bocek opened an office in Manassas, Virginia and in the summer

---

[2]   Citations to "2013 Tr." refer to the transcript of the nonjury trial Judge Hilton held on the issue of liability on December 9, 2013.  [Dkt. 220.]

of 2012 he opened a second office in Germantown, Maryland.  (Tr. 114-115.)  Bocek's income from those practices is unknown, but Bocek previously testified that those practices were not profitable in 2013.  (2013 Tr. 117.)

Bocek entered into the consulting agreement with JGA on November 10, 2010, less than three weeks after being fired from ACC.  (Def.'s Exs. 1, 25-C.)  Upon his initial interactions with Amato, Bocek did not disclose his intention to acquire ACC, although that acquisition was on his mind.  (Tr. 116.)  Bocek raised the possibility of acquiring ACC to Amato five days later.  (Def.'s Ex. 2.)  Bocek explained the cause of his firing as relating to his high salary.  (*See* Tr. 100-101.)  Bocek also repeatedly requested that his name be kept out of Amato's discussions with the Estate for the purchase of ACC, because his lawyer was involved in severance negotiations with ACC.  (*See* Def.'s Exs. 3, 4, 5, 6, 8, 20.)

Bocek never disclosed to Amato the allegations of sexual harassment, prescription forgery, or the no-trespass orders.  (Tr. 101.)  Amato did not question Bocek further about his firing because Amato believed Bocek's explanation that his salary caused his termination.  (Tr. 187-188.)

The Court credits Amato's testimony that he would never have entered into a business relationship with Bocek if he

knew of Bocek's history with ACC.[3]   (Tr. 134-136.)   Amato

credibly explained that JGA's clients and lending sources rely

on JGA to screen investment opportunities, including a client's

character.   (Tr. 135.)   Amato terminated JGA's contract with

Bocek after verifying the information he learned from ACC's

practice manager about Bocek's firing.   (Tr. 136-137; Def.'s Ex.

27.)   By that time, the Estate had already petitioned the

Pennsylvania court to approve JGA's acquisition of ACC.   (Def.'s

Exs. 28, 29.)

     The Court credits Amato's testimony that, upon

terminating JGA's agreement with Bocek, Amato had no intention

to continue with the ACC acquisition.[4]   (Tr. 137.)   It was

investor Brian August ("August") who proposed continuing with

the ACC transaction.   (Tr. 137.)   Additionally, although Bocek's

counsel sent a letter to Amato warning him not to continue with

the ACC acquisition, August's lawyer advised Amato that the

transaction was legal.   (Tr. 137-138.)   Several other facts

corroborate that August, not Amato, was the driving force to

continue with the ACC acquisition.   For example, August was the

party with the financial clout to conduct the transaction,

---

[3]   The Court's acceptance of Amato's credibility on this issue
is based on Amato's demeanor at trial and the corroborating
circumstances described in the findings of fact.
[4]   The Court's acceptance of Amato's credibility on this issue
is based on Amato's demeanor at trial and the corroborating
circumstances described in the findings of fact.

August and his wife acquired a larger interest in A2, August continues to operate ACC after Amato resigned, and August unilaterally reduced Amato's ownership stake in A2 from 49 percent to 3 percent.  (Tr. 137-138, 169; 2013 Tr. 7.)

The Pennsylvania court approved the acquisition of ACC on June 22, 2011.  (2013 Tr. 82.)  During 2011, Amato and August attempted to manage ACC according to the "status quo" while they got their "feet wet."  (Tr. 143.)  The new owners did make some changes at ACC during this time, including hiring a few new doctors and losing the ability to bill for Medicare because they failed to register.  (Tr. 144.)  Revenues for 2011 totaled $3,790,771.[5]

Because of the transfer of ownership, insurance companies conducted an audit of ACC at the end of 2011.  (Tr. 148-149.)  From these audits, the new owners learned that ACC's past billing practices were inappropriate.  (Tr. 148-149.)  The new owners were forced to change procedures, causing gross revenues to drop "tremendously."  (Tr. 149.)  ACC's gross revenue in 2012 dropped to around $3 million.  (Def.'s Ex. 35.)  To shore-up ACC, A2 issued a capital call and Amato stopped working for ACC in August 2012.  (Tr. 157.)  The only payment

---

[5]   This amount was reached by totaling the $1,833,976 ACC generated from January 1, 2011, through May 31, 2011, plus the $1,956,795 reported on A2's 2011 federal income tax return. (Def.'s Ex. 33, Pl.'s Ex. 12 at sched. 2.)

Amato ever received from A2's operation of ACC was $74,999 in salary during the last six months of 2011.  (Tr. 158.)  August also earned that amount in 2011 for his management role at ACC. (Tr. 158.)

After acquiring ACC, Amato formed the belief that the company was worth "somewhere south" of $600,000.  (Tr. 156, 188-189)  This valuation was a steep adjustment from his belief early in the due diligence process that ACC was worth around $3 million.  (Tr. 156, 188.)  Amato's valuation changed because he realized that ACC's improper billing practices inflated revenues.  (Tr. 155-156, 188.)  With the appropriate practices in place, Amato formed the belief that a 2010 valuation report ("2010 Report") prepared by Hempstead & Company ("Hempstead") accurately valued ACC based on the value of its assets, rather than by projecting its expected income.  (Tr. 155, 188, 191.)

Hempstead prepared the 2010 Report on August 23, 2010, and valued ACC at $620,000.  (Pl.'s Ex. 5 at 4.)  This Report applied an asset-based approach, which focused on the value of ACC's underlying assets and liabilities.  (*Id.*)  Hempstead believed this approach was best because ACC had low net revenue in 2009 and expectations for 2010 did not suggest growing revenue or positive earnings.  (*Id.*)  Hempstead also considered ACC's financial performance from 2005 through April 2010,

including the fact that ACC had some nonrecurring expenses during those times.  (Pl.'s Ex. 5 at 2-4.)

Plaintiff's expert Estabrook, by contrast, prepared a report for this litigation on August 12, 2011 ("2011 Report"), valuing ACC at approximately $2,232,000.  (Pl.'s Ex. 12.) Estabrook's valuation was a weighted average of two methodologies, an income-based approach and a market-based approach.  (Tr. 47-48.)

Estabrook's income-based approach valued ACC at $2,637,594 in June 2011.  (Pl.'s Ex. 12 at 9.)  He reached this valuation by first estimating that ACC will receive revenue of $4,600,000 a year.  (Tr. 45.)  This figure came from assuming that revenue from the first five months of 2011 would continue throughout the year.  (Tr. 46, Pl.'s Ex. 12 at 17, sched. 2.) He then increased that projected revenue by 5 percent.  (Pl.'s Ex. 12 at 17, sched. 2.)  Estabrook then estimated ACC's profitability rate based on normalized earnings before taxes ("EBT").  (Pl.'s Ex. 12 at 17, sched. 2.)  After adding nonrecurring expenses back into ACC's net revenue in 2005 through 2011, Estabrook estimated ACC's profitability rate to be 13.96 percent.[6]  (Pl.'s Ex. 12 at 17, sched. 2.)  Applying this

---

[6]    References to "profitability rate" within these findings of fact and conclusions of law are intended to be synonymous with a ratio of earnings before taxes to revenue, as used by Estabrook in the 2011 Report.  (*See* Pl.'s Ex. 12 at sched. 2.)

profitability rate to the $4,600,000 revenue estimation resulted in a normalized net annual earnings estimate of $639,400 before taxes and $478,271 after taxes.  (*Id.*)  Then, Estabrook applied a "mid-year convention adjustment factor" to account for cash flow being received ratably throughout the year, resulting in an adjusted net income of $532,794 a year.  (*Id.*)  Estabrook then applied a 20.2 percent capitalization rate to reach a valuation of $2,637,594.  (*Id.* at 18.)

Under the market-based approach, Estabrook applied the merger and acquisition method of valuation.  (Pl.'s Ex. 12 at 21.)  This method determines value by deriving pricing variables from the sales of comparable companies and applying those variables to the subject company's financials.  (*Id.*)  Estabrook identified pricing variables from transactions of twenty-one companies ranging in size from $144,000 to $125 million in annual gross revenue.  (Pl.'s Ex. 12 at sched. 6.)  He then applied those variables to ACC's estimated revenue of $4,600,000 and EBT of $639,400 and weighted the products at 50 percent each.  (*Id.*)  After increasing the product of these calculations by 10 percent for an inherent lack of marketability discount, this market-based analysis valued ACC at $2,287,299.  (*Id.* at 21, sched. 5.)

To reconcile these two approaches, Estabrook weighted the product of the income-based and market-based valuations.

(Tr. 48; Pl.'s Ex. 12 at sched. 1.)  The weighted average of these two approaches resulted in a valuation of $2,479,962. (Pl.'s Ex. 12 at sched. 1.)  He then applied a 10 percent marketability discount, resulting in a final fair market valuation of $2,232,000.  (*Id.*)

**IV.      Conclusions of Law**

Bocek contends that the above facts entitle him to the imposition of a constructive trust on the assets of ACC and various awards of compensatory damages, punitive damages, and attorneys' fees.  As explained below, the Court concludes that Bocek's unclean hands preclude the remedy of a constructive trust, but that Bocek is entitled to $156,000 in compensatory damages, plus postjudgment interest.  The Court will not award punitive damages, attorneys' fees, or prejudment interest.

The Court will first address Bocek's claim for the imposition of a constructive trust.

**A.      Constructive Trust**

Arguing under equity principles, Bocek contends that Defendants and their assigns hold ACC's assets as his constructive trustees.  Thus, he seeks to compel the constructive trustees to return ACC's assets and all traceable proceeds to him.  (Pl.'s Findings at 9.)

As a starting point, Bocek is correct that "where one person sustains a fiduciary relation to another he can not

16

acquire an interest in the subject matter of the relationship adverse to such other party.  If he does so equity will regard him as a constructive trustee and compel him to convey to his associate a proper interest in the property or to account to him for profits derived therefrom." *Horne v. Holley*, 167 Va. 234, 240, 188 S.E. 169, 172 (1936).

Bocek overlooks, however, that the imposition of a constructive trust is an equitable remedy that will not issue when the plaintiff has unclean hands.  *See United States v. $3,000 in Cash*, 906 F. Supp. 1061, 1066 (E.D. Va. 1995); *Everett v. Bodwell*, 185 Va. 405, 407, 38 S.E.2d 319, 320 (1946).  In other words, "[e]quity will not give relief to one seeking to restrain or enjoin a tortious act when he has himself been guilty of fraud, illegality, tortious conduct or the like in respect of the same matter in litigation." *Cline v. Berg*, 273 Va. 142, 147, 639 S.E.2d 231, 234 (2007) (quoting *Richards v. Musselman*, 221 Va. 181, 185, 267 S.E.2d 164, 166 (1980)).  Thus, a constructive trust will not be recognized when "violations of conscience as in some measure affect the equitable relations between the parties in respect to something brought before the court for adjudication." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).

The Court concludes that equity will not recognize a constructive trust in this case because Bocek intentionally

mislead Defendants with respect to both the formation and the objective of their fiduciary relationship.  First, Bocek intentionally provided incomplete information regarding the basis of his firing from ACC when he disclosed that his salary caused his termination, without mentioning the sexual harassment, prescription forgery, or no-trespass orders.  As Amato credibly testified, these omissions were relevant because Bocek's contentious history with ACC and character flaws would have affected the financing options available for this acquisition and eliminated the possibility that JGA and Bocek could operate ACC in partnership, something Bocek had proposed as an alternate funding option.  (*See* 2013 Tr. 102; Tr. 135.) The Court credits Amato's testimony that he would never have entered into a fiduciary relationship with Bocek for ACC's acquisition if he knew of Bocek's reason for termination from ACC.  (Tr. 135.)

Second, Bocek distorted Defendants' understanding of the objective of the fiduciary relationship by intentionally misleading Defendants about why his name must be kept out of the negotiations.  Bocek stated several times that his name should be kept out of the acquisition negotiations so as to avoid disrupting his severance package negotiations.  (*See* Def.'s Exs. 4, 6, 8, 20.)  This statement was true, but it was a deceivingly incomplete truth.  Bocek also knew that the revelation of his

involvement would cause ACC's practice manager to "try to prevent [Bocek] from buying the practice" because of the actual circumstances of his termination.  (Tr. 102.)  Thus, Bocek led Defendants to believe that by acting as a straw man for Bocek, they were primarily allowing Bocek's severance discussions to continue unimpaired.  But in fact, and as Bocek knew, Defendants' role as a straw man purchaser allowed Bocek to pursue a transaction that would not have been possible at all otherwise.  As Amato aptly stated in the 2013 trial, "[h]e used us from the beginning to make this thing happen hoping we would never find out."  (2013 Tr. 102.)  Because Bocek's intentionally misleading statements go directly to the formation and the objective of the fiduciary relationship at issue, they preclude the remedy of a constructive trust in this case.

Of course, Bocek's misconduct is not a legal defense for Amato's breach of fiduciary duty.  Nor is the Court unaffected by evidence indicating Amato considered charging Bocek an inflated price for ACC's assets even before Amato discovered Bocek's deceit.[7]  But in equity, Bocek's misconduct

---

[7]   In his testimony during the 2013 Trial, Amato explained that the statements regarding charging a price over $1,000,000 for ACC were made only in response to Bocek asking for creative financing options to compensate for Bocek's inability to contribute capital to the transaction.  (*See* 2013 Tr. 54-55, 59-60, 70-71.)  Furthermore, in questioning from the court in the 2013 trial, counsel for Bocek conceded that his breach of

weighs heavy in the Court's consideration.  To compel the transfer of ACC or its proceeds to Bocek would be to order a transaction that would not have been possible if Bocek dealt honestly with Amato.  Such an order would reward Bocek's own deceit in a way that equity will not allow.  Accordingly, the Court will not regard Defendants or their assigns as constructive trustees of ACC's assets.

### B.        Compensatory Damages Claims

Despite concluding that a constructive trust should not issue, the Court must also consider whether Bocek is entitled to compensatory damages for injuries he suffered, as compared to the restitutionary award discussed above.  *See Red Cardinal Fifteen, Inc. v. Lange*, 1997 WL 33122, at *8 (4th Cir. 1997) ("The appropriate monetary remedy for a breach of fiduciary duty may include both compensatory damages reflecting the value of any resulting loss to the plaintiff, and, in addition, a restitutionary award of any financial benefits realized by the wrongdoing."  (citing 2 Dobbs, Law of Remedies § 10.4, at 668 (2d ed. 1993)) (applying South Carolina law)); *see also Suntrust Bank v. Farrar*, 277 Va. 546, 554, 675 S.E.2d 187, 191 (2009) (considering proof of compensatory damages in breach of fiduciary duty case).

---

fiduciary duty claim was not based on these communications. (*See* 2013 Tr. 76.)

To receive an award of compensatory damages, a plaintiff must prove two factors.  First, "a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted." *Saks Fifth Avenue, Inc. v. James, Ltd.*, 272 Va. 177, 189, 630 S.E.2d 304, 311 (2006).  Second, "a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Id.*  Claims for compensatory damages must be proved with reasonable certainty.  *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 400, 732 S.E.2d 676, 686 (2012).  This analysis focuses on whether there are "sufficient facts to support the award."  *Id.*  A "reasonable basis of computation" will satisfy this standard, but "contingent, speculative, or uncertain" damages will not.  *Id.*  This standard does not require that damages be calculated with "absolute exactness." *Id.*

Bocek contends that he satisfies this burden with respect to the following claims of compensatory damages: (1) $1,232,000 in lost opportunity to acquire ACC's assets; (2) $2,100,000 in lost income; (3) $600,000 in mitigation expenses; (4) $150,000 in payments that A2 distributed to August and Amato; (5) $6,000 in funds Bocek paid to JGA for its services; and (6) $250,000 in emotional damages.  The Court will consider each claim in turn.

### 1.        *Lost Opportunity Claim*

Bocek contends that Defendants' breach caused him to lose the opportunity to purchase ACC's assets for $1,000,000, thereby injuring him in the amount of the fair market value of ACC minus $1,000,000. Because the Court finds that Bocek has not proven the value of ACC to have been over $1,000,000, the Court will not award damages for the lost opportunity to purchase ACC for that price.

The Court turns first to the causation element, which Bocek has satisfied. It is the law of the case that Defendants breached their fiduciary duties by appropriating Bocek's opportunity to purchase ACC's assets. *See Bocek*, 616 F. App'x at 575. When Defendants assigned the right to acquire ACC to A2, Bocek was able to pay the $1,000,000 purchase price and was prepared to do so. (*See* 2013 Tr. 57, 59-60, 88, 122.) Furthermore, JGA could have transferred ACC's assets to Bocek as a silent partner, without jeopardizing the Estate's approval of the deal. (2013 Tr. 39-40.) Thus, Bocek was ready and able to purchase ACC from Defendants and Defendants were able to transfer ACC to Bocek. This transaction did not occur directly and proximately because Defendants breached their fiduciary duties by appropriating the ACC opportunity for themselves. Thus, causation is present.

Despite that conclusion on causation, the Court concludes that Bocek has not sufficiently proven that the fair market value of ACC was more than $1,000,000 in 2011. Accordingly, Bocek is not entitled to damages for the lost opportunity to purchase ACC for that price.

The Court finds that the most credible method for valuing ACC was the asset-based approach, as applied by the 2010 Report. (Pl.'s Ex. 5.) The asset-based approach is a generally accepted valuation method that compares a company's assets to its liabilities. (*See* Pl.'s Ex. 12 at 15); *see also United Co. v. Keenan*, No. 1:06cv0071, 2007 WL 4260930, at *16 (W.D. Va. Nov. 30, 2007) ("[T]here are three generally accepted methods, including the income approach, the market approach and the asset-based approach." (citing Shannon P. Pratt et al., Valuing a Business, The Analysis and Appraisal of Closely Held Companies 46-47 (4th ed. 2000))). Hempstead employed this approach after correctly concluding that ACC was only marginally profitable in 2009 and that near-term outlook did not provide a confident projection of increased earnings. (Pl.'s Ex. 5 at 4.) That assessment was accurate, as ACC earned net profit of less than $6,000 in 2010 and suffered substantially decreased revenues in 2011. (Pl.'s Ex. 12 at sched. 8; Def.'s Ex. 33.) Additionally, ACC's prior billing practices inflated revenue, which undermines any valuation that directly relies upon that revenue as a

23

predictor of future earnings.  (Tr. 62.)  Applying the asset-based approach, Hempstead valued ACC at $620,000, which it cross-checked with a market-based approach.  Accordingly, the Court finds $620,000 to be the most credible valuation of ACC.

Estabrook's critiques of the 2010 Report are not persuasive.  First, Estabrook testified that applying the asset-based approach was inappropriate because it assumed ACC would lose money in 2010.  (Tr. 63.)  In fact, as described above, Hempstead accurately assessed that "neither the Company's recent history nor the near-term outlook for the Company suggest growing revenues or positive earnings."  (Pl.'s Ex. 5 at 4.)  Second, Estabrook's critique that Hempstead did not account for nonrecurring expenses is unconvincing, as the 2010 Report did consider nonrecurring expenses.  (Tr. 58; Pl's Ex. 5 at 2.)  Lastly, the fact that Hempstead did not have complete financials for 2010 and 2011 does not discredit the valuation because those financials confirm that ACC's earning and profitability were speculative.

The Court finds the 2011 Report's valuation unreliable.  In that report Estabrook applied versions of the income-based approach and the market-based approach.  Although both of these approaches are generally accepted valuation methods, the Court finds error with the application of those

approaches in this case.  *See Keenan*, 2007 WL 4260930, at *16.
The Court will address each valuation method in turn.

Within the income-based approach, Estabrook conducted
a "capitalization of earnings" calculation resulting in a
valuation around $2,600,000 before being discounted.  As an
initial matter, the Court finds the capitalization of earnings
approach was ill-suited to value ACC in 2011.  This approach
relies on an estimation of future earnings and requires
"[s]tabilized earnings or cash flows expected to continue into
perpetuity." (Pl.'s Ex. 12 at 16); s*ee Shooltz v. Shooltz*, 27
Va. App. 264, 273 n.5, 498 S.E.2d 437, 441 n.5 (Va. Ct. App.
1998).  ACC's financials did not indicate stability into the
future.  The first year after the prior owner's death, ACC's
gross revenue decreased by 7.8 percent.  (Pl.'s Ex. 12 sched.
8.)  Gross revenues decreased by another 3.8 percent the second
year, 2010.  (*Id.*)  ACC's net earnings decreased at an even more
alarming rate, dropping 81.5 percent in 2009 and 93.6 percent in
2010.  (Pl.'s Ex. 12 at sched. 8.)  Even accounting for
nonrecurring expenses does not stabilize this trend, as net
earnings dropped 41.3 percent in 2009 and 55.1 percent in 2010
after nonrecurring expenses are added back.  (Pl.'s Ex. 12 at
sched. 2.)  Additionally, it is speculative whether Bocek could
have returned ACC to its past profitability, as Bocek had no
experience with the business side of medical practice ownership

(Tr. 101-102), he intended to fire the practice manager upon acquiring ACC (Tr. 120), and he expected to cut offices and staff at ACC (Def.'s Ex. 2).   Accordingly, the Court agrees with the Hempstead report in concluding that the capitalization of earnings method was not a reliable method for valuing ACC. (Pl.'s Ex. 5 at 4.)

Even if an income-based approach could reasonably value ACC, Estabrook did not reliably apply that approach in this case.   First, Estabrook began his income-based valuation with an unrealistic estimation of ACC's earnings.   Estabrook used revenues from only the first five months of 2011, which he grew by 5 percent.   (Pl.'s Ex. 12 at 17.)   These five months provided an unreliable estimate of ACC's success under Bocek's ownership because Bocek did not even work at ACC during 2011. Additionally, revenue during those five months was inconsistent with revenue from the prior two years and an inaccurate measure of revenues ultimately achieved in 2011.[8]  *See United States Inspect, Inc. v. McGreevy*, No. 160966, 2000 WL 33232337, at *14 (Va. Cir. Ct. Nov. 27, 2000) (Estabrook arguing in a different case that another expert's capitalization of earnings valuation

---

[8]     Contrary to Estabrook's projected 2011 revenue of $4,600,000, ACC actually earned only $3,790,771 that year.   (*See* Def.'s Ex. 33, Pl.'s Ex. 12 at sched. 2.)   In mentioning these 2011 results, the Court is cognizant that Amato and August's operation of ACC could have been a cause for the decreased revenues.

was unreliable because it was based on revenues that "were
atypical of both the historic performance of the company and any
legitimate projection of its future earnings").  Furthermore,
Estabrook *grew* ACC's revenues by 5 percent, despite the fact
that ACC's revenue had decreased in the prior two years under
Bocek's management.  Estabrook compounded his error by
calculating ACC's profitability rate based on estimates from
2005 through 2011.  This was likely done to capture the high
profitability rate from 2005, 2006, and 2007, when Valentine
owned the business.  Had Estabrook used ACC's profitability rate
from the years of Bocek's tenues as medical director, his
valuation would have been much lower.  In sum, the Court finds
that the income-based approach was not a reliable method for
valuing ACC and Estabrook's application of that approach was
unreliably applied so as to generate an unreasonably high
valuation for ACC.  As such, the Court affords no weight to this
valuation.

        The 2011 Report's merger-and-acquisition valuation
does not fare any better.  Although this is a generally accepted
valuation method, Estabrook did not credibly apply that method
here for several reasons.  (*See* Pl.'s Ex. 12 at 21); *see also*
*Keenan*, 2007 WL 4260930, at *16; *McGreevy*, 2000 WL 33232337, at
*15.  First, Estabrook's merger and acquisition analysis relies
upon the same measures of projected ACC earnings and

profitability that the Court found to be erroneous within the capitalization of earnings analysis. (*See* Pl.'s Ex. 12 at 21, sched. 5.)  Therefore, this valuation is rendered similarly unreliable.

Second, the "comparable" companies that Estabrook selected to determine his pricing variables do not bear a reliable resemblance to ACC.  *See McGreevy*, 2000 WL 33232337, at *15 (finding market-based approach unreliable when companies compared "have almost no similarity" to the subject company). Looking at ACC's revenues, the 2010 Hempstead Report concluded that a range of comparable companies could include businesses grossing between $1,000,000 and $40,000,000.  (Pl.'s Ex. 5 at 3.)  Although the Court considers that to be an overly inclusive group of "comparables," only six of the twenty-one companies[9] Estabrook considered even fit this broad range.  (Pl.'s Ex. 12 at sched. 6.)  Estabrook's sample of comparable companies includes thirteen businesses with revenue below $1 million, and four businesses with revenue over $20 million, including two with revenue over $100 million.  (Pl.'s Ex. 12 at sched. 6.) The Court cannot soundly rely on a valuation that derives pricing multiples from incomparable companies and applies those

---

[9]   Estabrook identified a total of twenty-six transactions of businesses he considered comparable, but he derived pricing variables from only twenty-one of those transactions.  (*See* Pl.'s Ex. 12 at sched. 6.)

multiples to unrealistic projections of ACC's revenues and
profitability.  Accordingly, the Court affords no weight to this
market-based valuation.

In conclusion, the Court credits the 2010 Report and
Amato's valuation of ACC at around $620,000.  Because this
valuation is less than Bocek would have paid to acquire ACC, he
has not sufficiently proven that he is entitled to damages for
Defendants' causing him to lose that opportunity.

### 2.    *Lost Income*

Bocek also relies upon the Estabrook report to support
his argument for lost income damages.  According to Bocek, that
report supports damages totaling $2,100,000 in salary he would
have paid himself as the owner of ACC.  For several reasons, the
Court does not find Estabrook's estimation to be a reliable
estimate of lost income.  Without the report, the only reliable
evidence of the salary Bocek would have received is the $150,000
that August and Amato paid themselves as practice managers in
2011.  Accordingly, the Court will award $150,000 in lost income
damages.

The Court finds Estabrook's estimation of income
unreliable for several reasons.  First, Estabrook bases his
entire estimation upon an unreliable calculation of Bocek's
prior earnings.  Estabrook's estimation establishes a baseline
salary and then grows that salary each year according to an

estimated cost of living increase.  The baseline Estabrook chose
was an average of Bocek's 2009 and 2010 salary.  (*See* Pl.'s Ex.
12 at 26; Tr. 68.)  Estabrook provided no explanation for
limiting his baseline salary to an average of these two years.
Estabrook did not factor in Bocek's full-time salary from 2007
or 2008.  (Tr. 68.)  Such incomplete use of information, in and
of itself, is a common reason for discrediting an earnings
estimation as speculative.  *See Greater Richmond Transit Co. v.
Wilkerson*, 242 Va. 65, 72, 406 S.E.2d 28, 33 (1991); *Bulala v.
Boyd*, 239 Va. 218, 233, 389 S.E.2d 670, 677 (1990).

        In this case, Estabrook's reliance on salary from only
2009 and 2010 created a speculatively high projection that was
not based on any reliable indication of what salary ACC could
realistically support.  In 2009 and 2010, Bocek's salary was
nearly double the average for an allergist at a practice twice
the size of ACC.  (*See* Pl.'s Ex. 12 at ex.6.)  Bocek's salary in
2009 was also nearly double the size of his own salary two years
earlier, when he was also managing 40 percent of ACC's case
load.  His salary grew automatically in 2009 and 2010 despite
the fact that ACC's revenue and profit declined.  This caused
Bocek's salary to increase as a percentage of gross revenue from
4.77 percent[10] in 2007 to 10.46 percent in 2010.[11]  The fact that

---

[10]    2007 Gross revenues were $4,713,168, whereas Bocek's
baseline salary was $225,000.  (*See* Pl.'s Ex. 12-2; Tr. 86.)

his salary increased without oversight due to the prior owner's death and that the burden of this salary contributed to Bocek's termination both cast doubt on the reliability of the 2009 and 2010 salaries as a basis for estimating future earnings. *See Vasquez v. Mabini*, 269 Va. 155, 159-61, 606 S.E.2d 809, 811-12 (2005); *Countryside Corp. v. Taylor*, 263 Va. 549, 554, 561 S.E.2d 680, 682 (2002).

Furthermore, although Estabrook recognized that his lost income estimation was a projection of future earnings (Tr. 64), he did not account for the following factors that would have affected ACC's future success: Bocek intended to fire ACC's practice manager upon acquiring ACC (Tr. 120); Bocek had no experience managing the business-side of ACC (Tr. 101-102); some loss of patients likely occurred during the eight months between Bocek's termination and the Pennsylvania court's approval of the sale;[12] Bocek anticipated the need for ACC to be "trimmed (likely number of offices and staff)" upon acquiring it  (Def.'s Ex. 2); and workplace tensions would likely result from the return of the medical director who was previously fired amidst allegations of sexually harassing a nurse and other improprieties (Def.'s

---

[11]    2010 gross revenues were $4,298,396, whereas Bocek's baseline salary was $449,428.  (*See* Pl.'s Ex. 12-2; Pl.'s Ex. 12 at 26.)

[12]    There is no evidence that Defendants' breach of their fiduciary duties delayed the Pennsylvania court's decision to approve the sale of ACC's assets to JGA or its assigns.

31

Ex. 25-C).  Instead of accounting for any of these potential impediments to ACC's ability to support Bocek's 2009 and 2010 income level, Estabrook selected the two years of Bocek's highest earnings ever and projected that those earnings would increase every year into the future without regard for ACC's previous revenue trend.  That projection was unreliably speculative.

The Estabrook projection is also inaccurate because it begins attributing salary and benefits to Bocek too early. Bocek could not have received income from ACC until the Pennsylvania court approved the sale of ACC to JGA or its assigns, which occurred on June 22, 2011.  Estabrook, however, begins attributing salary and benefits to Bocek on February 1, 2011, resulting in an overestimation of earnings of between $100,000 and $115,000 under Estabrook's projections.  (*See* Pl.'s 12 at ex.5.)  This overestimation further reduces the Court's confidence in the 2011 Report and contributes to the Court attributing no weight to Estabrook's lost income estimation.

The Court also cannot rely upon Estabrook's identification of the median income for an allergist as $225,800 to form an estimation of lost income because that estimation assumes a medical practice of ten physicians.  (*See* Pl.'s Ex. 12 at ex.6.)  ACC, however, had only five doctors when Bocek was

32

practicing and he was the only full-time, board-certified
allergist.  (Tr. 82; Def.'s Ex. 2.)

Outside of Estabrook's report, there is very limited
evidence indicating what salary Bocek could have reasonably
earned as the owner of ACC from 2011 onward.  Prior to trial,
the Court reopened discovery to permit Bocek to investigate
ACC's recent financial performance, among other issues relevant
to damages.  Bocek did not conduct any depositions during that
time or properly serve any subpoenas for ACC or A2 financials.
Thus, the only reliable indication of lost income is that Amato
and August paid themselves a combined salary of $150,000 in 2011
for their management of ACC.  Had Bocek acquired ACC, he
reasonably would have paid himself at least as much as these
managers received.  Accordingly, the Court will award Bocek
$150,000 in lost income damages, as the only amount reliably
proven.

### 3.        *Mitigation Expenses*

Bocek also claims that he incurred $600,000 in
expenses in his attempt to mitigate damages.  The Court will not
award these purported mitigation expenses as damages.

The cost of mitigation may be an element of a
plaintiff's damages.  *See Nat'l Hous. Bldg. Corp. v. Acordia of
Va. Ins. Agency, Inc.*, 267 Va. 247, 253, 591 S.E.2d 88, 92
(2004).  The $600,000 Bocek refers to is not a mitigation

33

expense.  Instead, it is the amount of loan principal Bocek received to start a new medical practice.  (2013 Tr. 107.)  The interest or fees associated with such a loan could, arguably, fall into the category of mitigation expenses.  But Bocek presented no evidence of such expenses at the December 8, 2015 trial or within his proposed findings of fact.  Nor did Bocek present argument as to how such loan expenses would be considered "prudently incurred, as a result of a fair exercise of judgment to make the damages less," and "reasonably warranted by, and proportioned to, the injury and consequences to be avoided."  25 C.J.S. *Damages* § 64 (Westlaw 2015).  Accordingly, the Court concludes that $600,000 in loan principal is not a mitigation expense that may form a part of Bocek's damages.

### 4.        *Fees Bocek Paid to JGA*

Bocek seeks compensation for the $6,000 he paid to JGA for services related to the acquisition of ACC.  Defendants do not contest that Bocek should recover this $6,000.  (Def.'s Findings [Dkt. 270] at 21.)  The Court agrees Defendants' breach of fiduciary duties caused Bocek to suffer these damages.  Accordingly, the Court's order of damages will include $6,000 for fees Bocek paid to Defendants for their services.

### 5.        *Emotional Damages*

The Court next concludes that Bocek has not carried his burden of proving his entitlement to $250,000 in requested emotional distress damages.

"The general rule in tort cases is that, in the absence of accompanying physical harm or wanton and willful conduct, emotional distress damages are not recoverable." *Cartensen v. Chrisland*, 247 Va. 433, 446, 442 S.E.2d 660, 668 (1994). Even if Defendants' conduct was sufficiently wanton and willful, Bocek failed to prove the causal connection between that conduct and any emotional distress. The only evidence of distress comes from Bocek's testimony in the 2013 nonjury trial, when he summarized his distress as a "prevailing feeling of distrust or loss of trust."[13]  (2013 Tr. 125.) Bocek also testified that the loss of income caused "a significantly less happy household," and he has "certainly been depressed," requiring antidepressants. (2013 Tr. 124-125.) Bocek has not carried his burden of demonstrating these injuries, to the extent they exist, are the direct and proximate cause of

---

[13]    In his opening statement at the trial on damages before this Court, Plaintiff's counsel stated that Bocek would testify as to the "enormous emotional impact" Defendants' breach of fiduciary duty had on him. (Tr. 27-28.)  However, Bocek never testified before this Court as to his emotional distress and Plaintiff's counsel did not mention emotional distress or emotional damages in his closing argument. (Tr. 81-124, 199-200.)

Defendants' wrongful conduct.  There is evidence that Bocek's marital and financial woes arose from his being removed from his employment by police escort under allegations of sexual harassment and prescription forgery, and barred from his prior practice by court order.  (*See* Def.'s Ex. 25-C.)  Given that Bocek failed to even raise the issue of emotional distress at the December 8, 2015 trial on damages, the Court finds this alternative explanation of emotional distress more credible and denies these damages.

### 6.  *Punitive Damages*

The Court concludes that punitive damages are not warranted in this case.  "Awards of punitive damages are not favored generally because they are in the nature of a penalty and should be assessed only in cases involving the most egregious conduct."  *Simbeck, Inc. v. Dodd Sisk Whitlock Corp.*, 257 Va. 53, 58, 508 S.E.2d 601, 604 (1999).  In a case involving breach of fiduciary duties, "punitive damages may be awarded only if the acts are done with malice and wantonness."  *Id.*; *Woods v. Mendez*, 265 Va. 68, 76, 574 S.E.2d 263, 268 (2003). Actual malice is defined as a sinister or corrupt motive such as hatred, spite, ill will, or desire to injure the plaintiff.  *See Peacock Buick, Inc. v. Durkin*, 221 Va. 1133, 1137, 277 S.E.2d 225, 227 (1981).

On this issue, the Court credits Amato's testimony and concludes that his conduct was not egregious enough to warrant punitive damages.  From Amato's testimony, the Court finds that August was the primary party interested in pursuing the acquisition of ACC after JGA terminated its contract with Bocek. Amato credibly testified that he had no intentions of acquiring ACC after terminating the relationship with Bocek, but that August sought to continue the acquisition.

Furthermore, Amato relied on counsel when forming the belief that he legally could pursue the ACC acquisition after terminating his relationship with Bocek.  Although this advice was ultimately incorrect and the reliance on counsel is not an absolute defense to punitive damages, it does weigh against such an award.  *See Flippo v. CSC Assocs. III*, 262 Va. 48, 58-59, 547 S.E.2d 216, 223 (2001) ("We agree that good faith reliance on the advice of counsel is relevant, but it is not an absolute defense to the imposition of punitive damages.").

Lastly, Bocek's unclean hands in relation to the acquisition of ACC and the fiduciary relationship also weigh against an award of punitive damages.  *See Ritlabs, S.R.L. v. Ritlabs, Inc.*, No. 1:12-cv-215, 2012 WL 6021328, at *8 (E.D. Va. Nov. 30, 2012) (considering comparable actions by plaintiffs when concluding not to award punitive damages for breach of fiduciary duty).

Bocek did not present evidence or argument for a claim of punitive damages at the trial on damages before this Court. (*See* Tr. 199-200 (Plaintiff's closing argument not mentioning punitive damages); *see also* Pl.'s Reply at 7-10 (supporting argument for punitive damages with only evidence produced in prior nonjury trial before Judge Hilton).)

The evidence Bocek relies on from the prior trial before Judge Hilton demonstrates Amato's pursuit of profit through illegal means, but does not demonstrate malice or wantonness toward Bocek.  (*See* Pl.'s Reply at 7-10.)  Punitive damages should not issue against a fiduciary for engaging in, what amounts to, "commercial hard ball." *Simbeck*, 257 Va. at 59; 508 S.E.2d at 605.  For example, in *Alliance Storage Technologies, Inc. v. Engstrom*, No. 4:11cv46, 2012 WL 1580544 (E.D. Va. May 3, 2012), a court in this district declined to issue punitive damages under Virginia law against a defendant who intentionally, purposefully, and without legal justification stole his beneficiary's confidential information and trade secrets and used that information for his own profit.  *Id.* at *6.  The court noted that the defendants' actions "appear to have been motivated by a desire to make money," rather than a "sinister or corrupt motive such as hatred, spite, ill will, or a desire to injure Plaintiff."  *Id.*  The facts of the present

case do not exceed those in *Alliance Storage*.  For the reasons
stated above, the Court will not award punitive damages.

### C.    Attorneys' Fees

Bocek also seeks an award of attorneys' fees under
"rules of equity" and "longstanding law in Virginia."  (Pl.'s
Findings at 13.)  The Court will not award attorneys' fees.

The general rule in Virginia is that "in the absence
of a statute or contract to the contrary, a court may not award
attorney's fees to the prevailing party."  *Prospect Devel. Co.
v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291, 301 (1999).  Bocek
does not base his claim for attorneys' fees on a statute, a
contract, or an exception to this general rule.  Instead, Bocek
relies on the Court's equitable power to award fees "when the
interests of justice so require."  *Hall v. Cole*, 412 U.S. 1, 4-5
(1973).  Such equitable fees may be justified "whenever
overriding considerations indicate a need for such a recovery."
*Id.*  As described above, Bocek does not come before this Court
with clean hands with respect to his fiduciary relationship with
Defendants.  Neither has Bocek demonstrated a level of
egregiousness comparable to constructive or intentional fraud by
Defendants.  *Cf. Prospect Devel. Co.*, 258 Va. at 92, 515 S.E.2d
at 301 (approving fees in fraud suit).  Accordingly, the Court
will deny Bocek's request for attorneys' fees.

### D.   Interest

Lastly, Bocek seeks that all compensatory damages awarded shall bear pre- and postjudgment interest.

Entitlement to prejudgment interest in diversity cases is a question of state law. *Thornhill v. Donnkenny, Inc.*, 823 F.2d 782, 787 (4th Cir. 1987). Virginia law vests discretion with the trial court as to whether a party is entitled to such interest. *See* Va. Code. Ann. § 8.01-382; *Cotter v. E. Conference of Teamsters Ret. Plan*, 898 F.2d 424, 429 (4th Cir. 1990) ("[W]e are hesitant to reverse a district court's determination of entitlement to prejudgment interest because such determinations are entrusted to the district court's discretion."). In cases where liability is fiercely contested and damages owed are not certain prior to judgment, such as this one, it is within the trial court's discretion to deny prejudgment interest. *See First Union Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005)("Where, as here, the liability issues were fiercely contested by the parties and the damages owed . . . were not certain prior to the judgment, we are of opinion that the district court did not abuse its discretion in declining to award prejudgment interest."). Thus, no prejudgment interest is awarded.

The availability of postjudgment interest in diversity cases is a question of federal law. *Forest Sales Corp. v.*

*Bedingfield*, 881 F.2d 111, 113 (4th Cir. 1989).  28 U.S.C. §
1961 states that "[i]nterest shall be allowed on any money
judgment in a civil case recovered in a district court."  The
date of calculation and rate to be applied are defined by
statute.  Accordingly, such postjudgment interest shall be
allowed here, in accordance with 28 U.S.C. § 1961.

### V.   Conclusion

For the reasons stated above, the Court will
(1) award Plaintiff compensatory damages of $156,000 plus
postjudgment interest and costs; (2) will deny damages for
emotional distress; (3) will deny punitive damages; (4) will
deny attorneys' fees; and (5) will deny prejudgment interest.

An appropriate order will issue.

|  | /s/ |
|---|---|
| March 23, 2016 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |